Cook v. Pickrel.

JOHN P. COOK, PLAINTIFF IN ERROR, V. HARVEY PICKREL, DEFENDANT IN ERROR.

Trial: EVIDENCE. The evidence examined and *Held* insufficient to sustain the verdict.

ERROR to the district court for York county. Tried below before NORVAL, J.

*France & Harlan* and *D. T. Moore*, for plaintiff in error.

*Sedwick & Power*, for defendant in error.

COBB, J.

This action was brought in the district court by Pickrel against Cook. The petition contains two counts, one of which charges " that  *  *  *  the defendant's dogs chased and drove about and worried plaintiff's horses. That by reason thereof the said horses of the plaintiff were greatly

28

damaged and injured so that one thoroughbred brood mare of the value of $300 was killed, and one thoroughbred colt was damaged in the sum of $150, and rendered of no value." And the other of which charges, "that said defendant * * * chased and drove about the plaintiff's horses with dogs in a negligent manner, and that in consequence thereof the said horses of the plaintiff of the value of $1,500 were greatly damaged and impaired, and that one thoroughbred brood mare, by reason thereof, of the value of $300, was killed, and one thoroughbred colt, the property of the plaintiff, was by reason thereof greatly damaged and injured, and rendered of no value whatever, to the plaintiff's damage $150, and other horses were injured by reason thereof in the sum of $150," etc.

The defendant, Cook, on the 7th day of February, 1883, filed his answer in said cause, in and by which he denied "each and every allegation in the plaintiff's petition contained."

It appears from the record that, before trial, there were three preliminary or dilatory motions made by counsel for Cook, all of which were overruled, and the overruling of two of which is assigned as error, and insisted on in the brief of counsel. These assignments cannot be considered, for the reason that, as set out in the record, these preliminary motions seem to have been made after the filing of the answer to the merits. The writer is of opinion that one of said motions, that to require plaintiff to reduce his petition to one count or single statement of his cause of action, would have been sustained had it been made and insisted upon before pleading to the merits. But of course, after a plea or answer upon the merits, and it remains on the files of the case, no motion or application of the character referred to will be allowed.

There was a trial to a jury, with a verdict and judgment for Pickrel, plaintiff. Cook, defendant, brings the cause to this court on error.

There are twenty-six errors assigned, some of which, as we have seen, cannot be considered, for the reason above given; and others, which are based upon the admission of irrelevant and improper evidence offered by Pickrel, and the exclusion of relevant and proper evidence offered by Cook, cannot be considered, for the reason that they are too general, not pointing out the evidence to which they severally refer. Such of the errors assigned as may be considered, and which are deemed sufficient to a proper disposition of the case, will be stated as they are examined and disposed of.

" 1. The verdict is not sustained by sufficient evidence."

The evidence preserved in the bill of exceptions is voluminous, consisting of two hundred and seventy written pages, and the cause having been brought to this court before the taking effect of the abstract law, is not abstracted. It will, therefore, be impracticable to present more than a brief *resume* of the evidence here, and that will be confined to the evidence applicable to points considered. Charles Bell, a witness, sworn and testified on the part of Pickrel, that he knows plaintiff and defendant; that he was herding cattle and horses for Pickrel on the day of the injury; he herded the horses just like the cattle. He drove them up a little after 3 o'clock, may-be later. " I got them drove up and went and got a lunch; I went out to get a horse, and got on the horse and saw the horses coming three-fourths of a mile away—come running in. This mare, Angeline, was first. When they come closer and run up, I saw this mare did not come up. I started and rode across some one's field south-west, and I met Eph. Gable and Clarence Lesh. They said—" Here witness was interrupted by plaintiff's counsel, who put to him the following interrogatory :

Q. How carefully did you watch the horses at the time you were herding them there? Counsel for defendant objected to this question as incompetent and irrelevant.

The objection was overruled and witness answered as follows:

A.   I herded the horses the same as I herded the cattle. They kept picking around. I had to watch the cattle in the herd. I had twenty-three or four head of horses, fifty-one head of cattle, eighty-three head in all; had no help. They kept trying to get away all the time. I kept rounding them up. They got over in the field out of sight. I did not dare to leave the cattle and go over and follow them. Got into the yard at Pickrel's at — o'clock and drove into the house.

Q.   Were you horseback?

A.   I was.

Q.   State to the jury where you found the mare?

A.   In the north-west corner of Mr. Cook's corral, dead.

\*      \*      \*      \*      \*      \*      \*

On cross-examination this witness testified as follows:

Q.   How far were these horses from you when you saw them cross (the wheat field)?

A.   I judge about three hundred yards.

Q.   Where did they go from there?

A.   Kept down the draw. The last time I saw them was over on Mr. Moyer's land on the sod next to Tolbert's.

Q.   How far were these horses from you when on Mr. Moyer's land?

A.   I judge about three-fourths of a mile, probably a little more or less.

Q.   Where were the cattle then?

A.   With me, where I was herding on the other eighty, I saw both at that time.

Q.   Cattle were with you?

A.   Yes, sir.

Q.   You say the horses were two thirds of a mile away?

A.   Yes, sir.

Q.   Where did the horses go from there?

A.   I could not tell.   It was then about two o'clock.

Q.   What is your best recollection?

A.   I don't remember; in fact I could not tell.

Q.   Last time you saw them was about two o'clock, three-fourths of a mile away.

A.   Yes, sir.

Q.   What did you do then?

A.   I took the cattle to the house.

*          *          *          *          *          *

Q.   Last time we saw you, you were eating dinner about three o'clock?

A.   Call it any way you wish.

Q.   When you got home you told him the horses got away?

A.   Yes; I told him they got away.   Said I better do something right away.   Went out to the stable to saddle the horse and started I met these boys.   Said that Tolbert was running the horses.   Did not go over the whole way. Said he was cursing Harv.'s (Pickrel's) horses.   He recognized the teams.

Q.   What time was this when he said he recognized the team to be Harv.'s?

A.   May-be 4 o'clock.

Q.   Where did you go then?

A.   Started down that way; I went to Tolbert's place and then down to Cook's.

Q.   What did you find out at Tolbert's?

A.   I did not see him; went on down.

Q.   Was he gone then?

A.   Yes; I met him coming back; said he seen no horses; somebody there with him, and he said he saw me out there, and missed the horses.

Q.   Where did you meet Tolbert?

A.   Coming home right at the four corners of these

lands.  I started from Harv.'s about 4 o'clock; drove about two and a quarter miles to Cook's; stopped at Lesh's and looked there.

Q.    What time did you look in Tolbert's stable ?

A.    About 4½ o'clock ; I left Harvey's about 4 o'clock, I think.

\*       \*       \*       \*       \*       \*

Q.    Did you see Tolbert after your horses ?

A.    Met him after he said that was it; said he saw the horses on Moyers' land ; saw some one out there trying to catch them.

Q.    Know who ?

A.    No, sir.

Q.    This about 5 o'clock ?

A.    Somewhere ; Louie saw a man out there, and were going from there ; after I saw I drove to Cook's yard ; I saw the boy and thought he was likely to know, though was in the barn.    Harv. got and looked in the barn; the boy said his mother drove them in the orchard.

Q.    Find any tracks? .

A.    I dont know ; I was not with them.

Q.    Where were you all this time?

A.    In the buggy.

Q.    Where was the buggy ?

A.    In the road.

Q. · Going which way ?

A.    Nearly west past the corral ; after he got here he says " drive back " on the west side of the corral, and I did.

Q.    Where was the dead horse ?

A.    Pretty near there, I believe.

Q.    Which end of the corral ?

A.    Northwestern.

Q.    Right at the corner?

A.    May-be west a rod.

The cross-examination of this witness was continued at great length, but I have quoted sufficient to present the substance of his testimony.

Harvey Pickrel, the plaintiff, was sworn and examined as a witness in his own behalf. After stating that he was acquainted with the defendant, his examination continued as follows :

Q. Were you acquainted with him last April a year ago ?

A. I was.

Q. You may state to jury whether you lost any horses about that time.

A. Yes, sir.

Q. What kind were they ?

A. It was a mare that died ; I had a couple of colts hurt.

Q. What time of the year was it?

A. I think it was the 16th day of April, 1882 ; I think it was on Sunday.

When did you first discover they were injured ?

A. On Sunday evening.

Q. Where were they at the time that they were injured ?

A. On Mr. Cook's premises.

Q. How did you first discover that the animals were injured ; what first called your attention to it?

A. In the evening just before sundown the horses that were out come up with the exception of one, and I noticed they had been badly run, and were running when they come up, and I noticed some of them were injured when they come ; one was lame when it come up, and the cuts on one went down to the knee ; this mare was gone when I went down.

Q. State to the jury where you found her?

A. At Mr. Cook's, right back of the corral lot or pasture.

Q. State what condition she was in ?

A. Well, I went down to his house and asked him if he had seen anything of the horses, and he told me he had.

Q. Did you ascertain where they were?

A. * * * I went down through the orchard and went in the corral; I saw horse tracks thick, and I saw from the tracks that there had been horses there; he told me before seeing the tracks that my horses had been there, and then told me that the mare was dead over the fence. They tore down the fence when they went over. I found her.

Q. Describe the condition she was in when you found the mare?

A. The fence had been—two posts were broken. The mare had fell, as near as I can tell by stepping about, it was by corn field, about seven rows on below, and broke her neck. We cut in her neck; it was, we all considered, broke; we thought it best to cut it to find out the cause the mare died of.

    *      *      *      *      *      *

Q. What was the condition of the fence?

A. The fence was torn down, for it cut the horse; the wire was off and some boards were off.

Q. What kind of a fence was it?

A. It was three boards and one wire; the wire was stretched above the boards about a foot.

    *      *      *      *      *      *

Q. What did you observe on the mare at the time you examined her?

A. She had the marks of the wire on her breast and a cut on her nose; it appeared to have struck her there as the mare was getting through; the wire might have turned with her.

Q. Where was the wire in front?

A. The wire, when I first found her, was in front of her; I threw it back.

    *      *      *      *      *      *

Q. What then did you observe in and about the colts that Sunday evening?

A. One of the colts was lame, very lame.

Q.   What condition was the lot in?

A.   There were tracks of dogs and horses, as though they had been running around it.

Q.   Were there very many tracks?

A.   A good many; looked like they had been around the lot several times.

Q.   What direction did they seem to be going.

A.   They seemed to come in at the southeast corner, go around the northwest corner, then south, then east, back to where they began to go around, and so on until they went over the fence.

Q.   What did you see there besides the horse tracks?

A.   I saw dog tracks.

Q.   In what direction did they go?

A.   In the same direction.

Q.   What peculiarity did you notice in reference to the dog tracks?

A.   The dog tracks?   The ground seemed to be pushed; the tracks drug; the tracks was in the ground from where the dog's foot first struck the ground from six or eight inches to a foot.

\*       \*       \*       \*       \*       \*

Q.   State the conversation you had with Cook.

A.   \*   \*   \*   He come that way and then I asked him how it happened.   He said he put them in the lot to catch them, and the dogs were after them and he could not get them off.   They appeared to be afraid and went running so fast, and were so frightened that they went right over the fence and took no notice; when they come there the horses went right over the fence.

Q.   Describe the condition of that corral, around it, all around, whether it was the same you described where the mare went over?

A.   No, sir.   There were parts of the fence that had no wire on.   It seemed to be higher on the north.   It would be, I think.

Q.  What side had wire on?

A.    I don't remember whether it had wire on the south side or not.    West, I don't think there was wire on it.    It had boards around.  To the southwest I think it was plowed ground.    I think it had been plowed in the fall, and up close to the fence, up about ten feet of it.    The horses ran around, right on the inside of that mostly.

Q.    Where was the gate the horses come in?

A.    On the southeast corner, next the house.

Q,    State to the jury whether you observed any other tracks of an animal except that of the horses and dogs near the gate?

A.    I observed the tracks of a man that come up to the gate.  I judged it was.  It looked like a man by the tracks.

Q.    What did Mr. Cook say, if anything, after that time, if you had a conversation with him after that day?

A.    He said when I saw him as to which way the horses come from.

Q.    State the whole conversation.

A.    He said the horses come in from the west of his house, west of the pasture lot.    I told him I did not think they did.    He said he could show me the tracks.    We went and looked for them and found them.

Plaintiff also testified that the black colt was injured in the shoulders and is lame whenever it runs now; think it always will be.    Never was lame before.    The bay colt was hurt on the wire.    Its legs swelled up, was hurt in two places, one of its legs was very sore.    That the mare was cheap at $200.    That one of the colts before the injury was worth $35.    After the injury it was of no value. That the other colt was worth $200 before the injury; after the injury, when cut on the legs, it was worth not to exceed $175.

He also stated that on the Sunday when the horses were injured they were in the care of Charles Bell for the purpose of herding them with the cattle on the prairie, on

lands, part of which belonged to him, plaintiff, and upon part of which he had permission of the owner to herd. That Bell was in his employ, and that he did not know how the horses came to get away from the herd.

The following question was put to plaintiff by his attorney:

Q. Do you know what experience he has had as a herder and of taking care of horses and cattle in herds. If so, what kind of a person is he to take care of horses and cattle?

The question was objected to by counsel for the defendant, as immaterial, irrelevant, and incompetent. But the court overruled the objections, and the witness answered:

A. I considered him a very good herder.

On re-examination plaintiff stated that he afterwards measured the height of the fence near the place where the horses went over, and that it was about forty-one inches high.

L. D. Lesh was sworn and examined as a witness on the part of the plaintiff. He corroborated the testimony of the plaintiff in the main as to the condition of the dead mare, the condition of the corral, and the horse and dog tracks in the corral, and the statements of Mr. Cook on Monday morning. · I quote from his testimony: "Cook said the horses came across the oats, through the oats and flax, and went right down the road to the house; while in the road the dogs took after them and they ran in the corral. He was trying to shut them up. They did not seem to see the fence but went right through it as though there was nothing there." This witness also agreed with Pickrel as to the value of the mare killed, and the damage to the colts.

D. P. Brown, a witness on the part of the plaintiff, corroborated the testimony of Bell, Pickrel, and Lesh in the main.

J. C. Campbell, a witness for the plaintiff, testified to a

conversation with Cook after the injury, in which Cook stated the facts substantially as he stated them to Pickrel in the presence of Lesh, Bell, and Brown, as testified to by them. Mr. and Mrs. C. F. Gunlack, witnesses for plaintiff, testified to seeing the horses going to and coming from Cook's place on the day in question. That when going towards Cook's the horses were trotting. They also saw them jumping over the fence from the corral and saw one or more of them fall. Mr. G. testified that the fence was about three and one-half feet high " and the wire about one foot." I understand him to mean that the boards were three and one-half feet high, and the wire about one foot above the boards. These witnesses testified also to a conversation with Cook, the evening of the injury, in regard to the horses and accident, in which Cook's statement was substantially the same as that hereinbefore stated. Neither of these witnesses saw or heard the dogs.

I. N. Inbody, sworn and examined as a witness for plaintiff, also substantially corroborated the testimony of Pickrel, Bell, Brown, and Lesh. He was a little more explicit than either of the other witnesses in stating the position of the mare as she lay with her neck broken, in reference to the corral fence. I quote:

Q. What distance did the mare lay from the fence?

A. Six or seven corn rows.

Q. From her head?

A. Yes, sir, from her head to the fence.

Mr. Tolbert, a witness for the plaintiff, testified that he remembers about the time Pickrel's mare was killed. That he was at home on that day from 10 o'clock " until about two hours by the sun." That he lives 100 or 120 rods from Cook's house, that he knows the direction of Cook's house from the house of witness. I quote from his testimony :

Q. State to the jury if you heard any noise in the direction of Mr. Cook's house on that day, and if so, state what it was.

A.   Well, dogs a barking and people holloaing.

Q.   Can you give the jury any idea how the holloaing was?

A.   A good deal like—well, every person does not holler the same way if he wanted the dog to go.   It was a good deal like everybody hollers when he wanted a dog to go. If I wanted a dog to run for something I say "sick him, sick him," and I guess that is the way he hollered then a good deal.

Q.   You know Mr. Cook's voice?

A.   Yes, sir; it was a good deal like his.

Q.   Do you know any of his boys?

A.   Yes, sir.

Q.   State to the jury whose voice it was.

A.   It was his.   (This answer was stricken out by the court on motion of defendant's counsel.)

Q.   Whose voice was it?

A.   I am positive it was Mr. Cook's voice.

E. Farmer, a witness, testified only as to the value of of the horses, in which he fairly corroborates the other witnesses.

I. Inbody, a witness for plaintiff, testified that he had seen Mr. Cook's dogs some four or five times as he passed there, before the accident, when the mare was killed. Counsel then asked him to state whether Mr. Cook had his dogs collared.   This question was objected to as irrelevant, etc., but the court overruled the objection, and witness testified in several forms and with a fair degree of certainty that the dogs were not collared.

J. C. Campbell, witness for plaintiff, was recalled, and testified that he was well acquainted with Mr. Cook's dogs, and that they were not collared.

C. F. Gunlack was recalled, and corroborated the testimony of the two last witnesses as to the dogs of Mr. Cook not being collared at about the time of the injury.

The foregoing is a fair *resume* of the evidence on the

part of the plaintiff.  There was evidence nearly equal in volume to that of the plaintiff introduced in behalf of the defendant, but its consideration is neither necessary nor proper in the examination of the question as to whether the evidence is sufficient to sustain the verdict.

The evidence tends to prove, and it may be said, sufficiently proves, that on the day upon which the injury was sustained, the plaintiff was the owner of and had in his possession twenty-three or twenty-four head of stock horses, also a herd of fifty-one head of cattle.  This stock was all being herded by Charles Bell, the hired man, or as is generally termed by courts and law writers, the servant, of the plaintiff.  It was the duty of the plaintiff to keep this band of stock under his control, and upon such range as by ownership, or privilege granted by the owners thereof, either expressed or implied, he had the right to pasture.  This duty on the day in question he did not perform, but on the contrary the band of horses was allowed to become separated from the cattle, and pass from the control or knowledge of the herder, and to go upon the premises of the defendant, and while so out from under the control of the plaintiff or his servant, and on the premises of the defendant, certain of them were killed and others injured.  From certain testimony offered by the plaintiff and admitted over the objection of the defendant, it would seem to be his theory, and possibly that of the court which tried the cause below, that when plaintiff had placed the stock in the care of a servant whom he believed, and had reason to believe, was faithful, and competent as a herder of stock, that he had discharged his whole duty, and was not responsible for any neglect of duty on the part of such servant.  It is not deemed necessary to more than state the proposition, nor to cite authorities, to show that such is not the law.  The books are full of cases where railroad companies, cities, and other employers, are held responsible for the negligence of their employees,

and I know' of no case holding that a belief, or confidence, on the part of the master, is a defense to him for the consequences of the negligent act of the servant. In such cases, the negligence of the servant is the negligence of the master.

Did the negligence of plaintiff's servant, through which the band of horses escaped from his control and knowledge, and went upon the premises of Cook, contribute to the loss of the mare and the injury of the colts? That it did, I think, cannot be seriously questioned. The direct and immediate cause of the injury was the horses jumping over a board fence with a wire on top, about a foot from the top board. This fence and wire was quite harmless to the horses as long as they kept away from it. They would have kept away from it as long as they remained under the eye and control of the herder. The herder's care and control stood between the horses and this danger. The negligent withdrawal of such care and control led directly, though not necessarily, to the injury and loss. Let us suppose that these horses, instead of going upon the premises of the defendant, when the plaintiff's servant negligently allowed them to escape from his control and knowledge, had gone upon the neighboring railroad track and been there killed, or damaged, by a passing train. The railroad company would have been liable for their value, it is true, but solely for the reason that such company had neglected to fence its track, as required by law. Now there is no law requiring farmers to fence their fields, nor to keep their corrals closed. So that if it be granted, for the purpose of this argument, that the fright to the horses, caused by the running and barking of the defendant's dogs, was the immediate cause or occasion of the accident to the horses, yet it is undeniable that their being at large without the control of the herder directly contributed to it.

Our statutes, § 16, chap. 4, Comp. Stat., provides,

" That the owner or owners of a dog or dogs shall be liable in an action for all damages that may accrue to any person or persons by reason of such dog or dogs killing, wounding, worrying, or chasing any sheep or other domestic animal belonging to such other person or persons," etc.

The evidence does not tend to prove that the death or injury of these horses was attributable directly to the " killing, wounding, worrying, or chasing of dogs." It does tend to prove that the chasing of the horses by dogs contributed to the injury. Notwithstanding the statute above quoted, whatever liability or fault may be held to attach to the owner of dogs contributing to the injury of stock, is in the nature of negligence in allowing his dogs to escape from his control and do the act complained of, for if the dog is under the control of its owner when doing the act, it is then the act of the owner and not of the dog. It then amounts to about this: Pickrel was negligent, through his servant, in allowing his band of horses to escape from his control and go upon the premises of Cook. Cook, under the provisions of the statute, was negligent in keeping dogs. I quote the following from Shearman and Redfield on Negligence, § 25, as the law applicable to this case: " One who is injured by the mere negligence of another, cannot recover, at law or in equity, any compensation for his injury, if he by his own or his agent's ordinary negligence or willful wrong proximately contributed to produce the injury of which he complains, so that but for his concurring and co-operating fault the injury would not have happened him, except where the more proximate cause of the injury is the omission of the other party, after becoming aware of the danger to which the former party is exposed, to use a proper degree of care to avoid injuring him."

There is no evidence in the case which tends to prove that, after Cook became aware that by reason of the neg-

ligence of Pickrel in allowing his horses to escape, and his own statutory negligence in keeping dogs on his premises, there was danger of the horses being injured, he omitted to use a proper degree of care to avoid injury to the horses. But on the contrary, while from the evidence or in the nature of things it utterly fails to appear that Cook ever became aware of the danger to the horses until after the injury, yet the evidence tends to prove that he used his best endeavors to secure the horses.

At the consultation we were all of the opinion, that for the reasons which I have thus endeavored to present, the verdict is not sustained by sufficient evidence, and that having on that point reached the conclusion that there must be a new trial, the other points would not be considered. I will, however, add that we were equally agreed that the question as to whether the defendant's dogs were collared at the time of the accident to plaintiff's horses did not properly arise in the case.

The judgment of the district court is reversed and the cause remanded for further proceedings in accordance with law.

REVERSED AND REMANDED.

THE other judges concur.