HARLAN J. NORMAN ET AL., APPELLANTS, V. GEORGE SPRAGUE, APPELLEE.

93 N. W. 2d 637

Filed December 26, 1958. No. 34451.

Beatty, Clarke, Murphy & Morgan, Donald W. Pederson, and Frank E. Piccolo, Jr., for appellants.

Daniel E. Owens and Russell & Colfer, for appellee.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, and BOSLAUGH, JJ.

CHAPPELL, J.

Plaintiffs, Harlan J. Norman and Hugh Leech, hereinafter designated by their last names or as plaintiffs, brought this action against George Sprague, hereinafter called defendant, seeking recovery of damages under section 54-601, R. R. S. 1943, for the alleged killing, wounding, worrying, or chasing plaintiffs' sheep by two coon dogs owned by defendant.

Paragraph I of plaintiffs' petition alleged in substance that on and after January 10, 1957, they owned and maintained about 1,000 sheep in a corn field on a farm in Chase County. Paragraph II alleged that defendant resided across the road therefrom and owned two coon dogs. Paragraph III alleged that during 2 weeks immediately preceding January 10, 1957, said dogs continually worried and chased plaintiffs' sheep and killed 19 of them. Defendant's answer denied all of paragraph III, and for want of any competent proof by plain-

tiffs of the allegations contained in such paragraph, the trial court properly withdrew from the jury defendant's alleged liability for the death of said 19 sheep.

Paragraphs IV, V, and VI of plaintiffs' petition also alleged that on January 10, 1957, defendant's dogs killed 26 of plaintiffs' sheep; wounded and injured 64 of them so that it was necessary to dispose of them at the best price obtainable; and that plaintiffs' remaining sheep were chased and worried by defendant's dogs, which caused said sheep to be thrown off feed and lose weight.

For answer, defendant admitted paragraph II of plaintiffs' petition; and for lack of information as to ownership of the sheep and the number thereof, defendant denied paragraph I, and denied all of paragraphs IV, V, and VI. Defendant also alleged that he had owned the two coon dogs for several years; that they had always been around in the area where defendant resides and among sheep and other livestock in such area, but said dogs never worried, chased, or killed any of them; and that plaintiffs' sheep, if any, died from disease or causes other than alleged in plaintiffs' petition.

Upon submission of such issues to a jury, it returned a verdict for defendant, and judgment was rendered accordingly. Thereafter, plaintiffs' motion for new trial was overruled, and they appealed, assigning in substance that: (1) The verdict and judgment were contrary to the evidence and law, and the trial court erred in overruling plaintiffs' motion for directed verdict on the question of liability of defendant made at the conclusion of defendant's evidence; (2) the trial court erred in failing to instruct on circumstantial evidence; and (3) the trial court erred in giving instruction No. 7. We do not sustain the assignments.

Section 54-601, R. R. S. 1943, provides in part: "* * * the owner or owners of any dog or dogs shall be liable for any and all damages that may accrue * * * (2) to any person, firm or corporation by reason of such dog or dogs killing, wounding, worrying or chasing any

sheep or other domestic animals belonging to such person, firm or corporation."

As early as Cook v. Pickrel, 20 Neb. 433, 30 N. W. 421, this court construed such statute and concluded in effect that the owner of dogs was not liable thereunder unless competent evidence established that the injury or death of such domestic animals was directly attributable to the killing, wounding, worrying, or chasing by the owner's dogs.

We have also held that in determining the sufficiency of evidence to sustain a verdict it must be considered most favorably to the successful party, that is, every controverted fact must be resolved in his favor and he should have the benefit of every inference that can be deduced therefrom. Clouse v. St. Paul Fire & Marine Ins. Co., 152 Neb. 230, 40 N. W. 2d 820, 15 A. L. R. 2d 1008.

Further, it is well established that: "In a jury case where different minds may draw different conclusions or inferences from the adduced evidence, or if there is a conflict in the evidence, the matter at issue must be submitted to the jury." Behrens v. Gottula, 160 Neb. 103, 69 N. W. 2d 384.

In the light of such rules, we have examined the pertinent evidence, which as summarized discloses the following: Norman lived on a farm 1½ miles south of Lamar. During the summer of 1956, he and Leech entered into an agreement whereby Leech agreed to purchase some sheep and Norman agreed to care for them. The profits were to be divided equally between plaintiffs. Pursuant thereto, Leech purchased and weighed 995 sheep in San Angelo, Texas, then had them trucked to Imperial and placed them in Norman's care on Norman's farm. The sheep were lambs which then weighed about 50 to 70 pounds each, but Norman kept no records; he did not even know the exact number of sheep involved, and only three of them were ever weighed after purchase and before January 10, 1957.

After pasturing the sheep on Norman's own wheat grounds for some time and also in various fields in other locations in that community, plaintiffs moved them into a 50-acre fenced corn field on the Whitten farm in October 1956. That field was located just across the road from defendant's farm and about 30 rods from defendant's farm yard. One Smith was in possession of the improvements on the Whitten farm at that time, but one Mauer, Whitten's son-in-law, occupied them as a tenant after about December 6, 1956, when Smith vacated the premises.

Norman usually drove over from his farm to such corn field each morning to look after the sheep and see that they had water and food. In the meantime, plaintiffs had lost several sheep without knowing the cause of death. Norman stated that: "* * * at one time we thought maybe it was kidney stones; some said it was and some said it wasn't." One dead sheep was posted and a kidney stone was pressure-forced out of it. Defendant, who acted as a kind of unlicensed veterinarian in the community, had so forced a kidney stone out of one of plaintiffs' live sheep, but it died. Defendant visited with Norman many mornings among the sheep, and observed that there were usually dead sheep and also sick live ones that stood stiff in their back parts, a symptom of kidney stones.

The sheep had been sheared about December 1, 1956, and within 2 or 3 weeks before January 10, 1957, plaintiffs found 10 dead sheep scattered throughout the field. Also, later and before January 10, 1957, they found nine more dead sheep in the same area. An examination of all of them by plaintiffs and some of them by defendant and a veterinarian failed to determine or discover what happened to such 19 sheep or caused their death, although one of them had a bruise on its neck which might have been a dog bite.

Prior to January 10, 1957, Norman and Mauer had many times seen defendant's rather large, lop-eared

coon dogs trailing and hunting through plaintiffs' field of sheep without killing, wounding, worrying, or chasing any of them in any manner, and no one ever did see them do so at any time, either prior to or on and after January 10, 1957. In that connection, once defendant asked Norman, " 'What do you think about them dogs running through your sheep,' " and Norman replied that he "didn't think they were hurting them," or, as stated by defendant, Norman replied, " 'No, let them go, I think they are protection on coyotes.' "

After dinner on January 10, 1957, Mauer saw one live sheep near his corrals, and a couple of hours later he saw three or four more there. An attempt to drive them away failed. They simply did not move, but stiffly stood their ground or lay down. He then heard some dogs out in plaintiffs' corn field barking and howling in the same manner as he had heard defendant's coon dogs do, and he assumed that they were defendant's dogs because he had seen them running back and forth from that field during the afternoon. He had never seen defendant's dogs chase or inflict any damage on plaintiffs' sheep, although he had heard them barking and had seen them trailing through the sheep in the field many times before January 10, 1957. After dark, about 6 p. m. on that date, Mauer tied his own dog in his barn, but that dog barked continuously. Mauer also heard dogs barking over in plaintiffs' corn field, so he telephoned Norman and told him to come over because there seemed to be a disturbance in his sheep. In that connection, there were other dogs in the neighborhood. A neighbor living ½ mile east of Norman's place owned a pretty good-sized dog that was a "cross with a police dog," but Norman testified that he never saw that dog where the incidents here occurred. Another neighbor had a shepherd dog, but Norman testified that he never saw such dog out there. Another neighbor who lived ¾ mile north of there had a dog, but Norman testified that he had never seen that dog

"tear around." Also, Mauer had a golden retriever. He testified that he had owned the dog only a few weeks so he kept the dog close to him and tied at night, and that he had no knowledge that the dog ever got out and molested plaintiffs' sheep. In such respects, plaintiffs argued that all other dogs in the neighborhood had been accounted for, as well as the possibility of attack by coyotes, upon the basis of modus operandi and physical facts, therefore, as a matter of law, the court was required to conclude that the injuries and death of plaintiffs' sheep were directly attributable to defendant's dogs. We cannot agree, because under all the facts and circumstances that issue was for determination by the jury.

Norman went over to the field immediately after being called by Mauer. He then drove through the gate, flashed his car lights, and saw a band of sheep circling around. He hollered, and defendant's two dogs came running out and away from the band in different directions. One ran to the road and Norman chased it home with his car, after which both dogs ran toward defendant's barn where their mother had been tied.

Norman testified that he got out of his car at defendant's house and, in response to his knock, defendant came to the door and said: " 'Harlan, have you seen my dogs?' " and Norman replied: " 'Yes, I chased the fools home.' " Defendant had a different version. In that connection, he testified that when Norman came to his door, defendant asked, " 'What's the matter, Harlan,' " and Norman replied, " 'Your dogs are in the sheep.' " In that connection, Norman testified that he thought defendant had been away from home all day, but defendant testified positively that he had been at home all day and had seen his dogs around his place several times during the day.

Both Norman and defendant then examined the dogs under the electric light in defendant's barn. There is a dispute about whether the dogs' tongues were hanging

out and they were panting, but be that as it may, they found no blood whatever on either dog, although when the sheep were later examined in the field, some of them were bloody and there was blood on the snow in the area. Norman claimed that he found a little piece of wool in one dog's mouth, but defendant denied that, and if it were wool, plaintiffs never made any effort to preserve it.

Norman and defendant then went to the corn field where they found some dead sheep and some wounded sheep with the flesh on their right shoulders torn downward in a similar pattern. However, defendant testified that they found no such sheep where Norman claimed he saw the dogs, and that the dead sheep lay farther north near a county road. They then picked up one sheep that was badly wounded and took it to defendant's house where defendant sewed it up. Norman then borrowed defendant's needle and thread, and returned to the field with Mauer where they worked on some of the wounded sheep until about 11 p. m. However, it was cold with snow on the ground, and the sheep were scared and hard to catch, so they left until morning. At that time, plaintiffs found 24 or 26 dead sheep but only some of them had been wounded as aforesaid. They also found 64 wounded sheep, so plaintiffs placed them and 154 others in a truck, in order to make a full load, and sold them to a buyer in Scottsbluff. The next day plaintiffs asked defendant if he were going to pay for damages to the sheep, and defendant suggested that they should come back after they had received returns from the sale at Scottsbluff. Plaintiffs testified that defendant promised to pay the damages, which defendant categorically denied. A few days later, plaintiffs returned and demanded $1,264 damages, and informed defendant that if that amount were not paid, it would be a whole lot more. However, defendant refused to pay, stating that his dogs did not cause any of the damage, and he wouldn't pay anything he didn't owe.

In that connection, plaintiffs' version was that defendant said his dogs didn't do that much damage, but defendant denied making such statement. Plaintiffs adduced evidence, some of which was remote and conjectural in quality or character with regard to the amount of damages, but nevertheless the trial court comprehensively submitted that issue to the jury, and it would serve no purpose to recite such evidence here.

Defendant testified that he had resided in Chase County since 1916 and had owned, trained, and hunted with coon dogs for 30 years. On January 10, 1957, he owned three such dogs. The two here involved were born September 24, 1952, and defendant had hunted with them since they were 18 months old. His other dog, their mother, was tied in his barn, but the first two were loose in the neighborhood at all times, even after January 10, 1957. However, plaintiffs kept their remaining sheep on Whitten's place about another week after January 10, 1957, but claimed that they did not see defendant's dogs loose again. Defendant, as did others, had often seen the two dogs trail through the sheep bands of neighbors, including plaintiffs, without paying any attention to the sheep, and the sheep paid no attention to the dogs but simply spread out and let the dogs go on through the band. Defendant testified, and others verified, that his dogs had never bothered any types of livestock; that they could not even be directed or forced to do so; and that they would run from any livestock that stood its ground. Defendant had seen coyotes in the neighborhood during the fall and winter of 1956-1957. A witness for plaintiffs, who had described the symptoms of kidney disease in sheep and the manner of death therefrom and had stated the reason why sheep died when chased by dogs and coyotes, testified that he had experience with both dogs and coyotes killing sheep. He testified that dogs chase and kill sheep for fun. However, coyotes generally do so for food during dark early mornings, and when one sheep is finally killed,

they usually quit. Such witness was a member of an association in Chase County which had been instrumental in procuring the county board to organize a coyote-killing campaign because there were more coyotes in that area than in other western counties. He testified that if several coyotes got in a band of sheep and chased or bit them, they would produce the same result as dogs would.

The party who occupied the Whitten improvements prior to December 6, 1956, where plaintiffs' sheep were being fed, was a witness for defendant. Such witness was familiar with defendant's dogs, and while living there had regularly seen them trail through the field and plaintiffs' bands of sheep, without chasing or attacking them or any other livestock in any manner. Defendant's brother-in-law testified that he lived in the same neighborhood. He was familiar with defendant's dogs. He had hunted with defendant and his dogs six or seven times between August and December 1956, and again in the fall of 1957. During that time, defendant's dogs had trailed through his own bands of sheep and those of neighbors many times, and he never saw the dogs chase, worry, or cause the sheep to mill around. Also, he never saw the dogs bother any other livestock. Another neighbor gave comparable testimony and recited that many times in the fall of 1956 and as late as the spring of 1957 he had hunted with defendant and his dogs, and that he had seen the dogs trail through the neighbors' bands of sheep without paying any attention to the sheep or any other livestock.

Much of the evidence heretofore recited was circumstantial, but some of it was directly conflicting. We conclude that the issues were for determination by a jury; that to have directed a verdict for plaintiffs on the issue of liability would have been entirely erroneous; and that the verdict and judgment thereon were not contrary to the evidence and law.

Plaintiffs argued that the trial court erred preju-

dicially in failing to instruct the jury on circumstantial evidence, although admittedly no request was made for such instruction. We do not agree.

In Osborne v. State, 115 Neb. 65, 211 N. W. 179, this court construed a rule of practice under both the criminal and civil code, and, citing authorities from this jurisdiction, said: "It is the duty of the court on its own initiative to instruct the jury as to the general rules of law applicable to the case, and in such a way as not, either by omission or by expression, to withdraw from the consideration of the jury an issue or essential element necessary for its determination. However, if an instruction is desired by either party which would serve only to guide the jury in weighing certain features of the evidence in connection with the issues, then in such case it devolves upon such party to request such specific instruction."

In Clark v. State, 151 Neb. 348, 37 N. W. 2d 601, quoting with approval from Fetty v. State, 121 Neb. 228, 236 N. W. 694, and citing other authorities from this jurisdiction, we held: "In the absence of a request therefor the trial court is not required to give a cautionary instruction relative to the weighing of circumstantial evidence." We conclude that the trial court did not err in failing to instruct on circumstantial evidence.

Plaintiffs also argued that instruction No. 7 given by the trial court was prejudicially erroneous. We do not agree.

In Brown v. Hyslop, 153 Neb. 669, 45 N. W. 2d 743, we held: "The meaning of an instruction, not the phraseology, is the important consideration, and a claim of prejudice will not be sustained when the meaning of an instruction is reasonably clear.

"When different instructions are given on the same subject, they should be considered together, and if they fairly submit the case, it will not be reversed for indefiniteness or ambiguity in one of the instructions.

"In determining whether or not there was error in a sentence or clause of an instruction, it will be considered with the instruction of which it is a part and the other instructions, and the true meaning thereof will be determined not from the sentence or phrase alone but by a consideration of all that is said on the subject." See, also, Myers v. Willmeroth, 151 Neb. 712, 39 N. W. 2d 423.

As recently as Tate v. Borgman, *ante* p. 299, 92 N. W. 2d 697, we held: "Instructions must be considered and construed together, and if they are not sufficiently specific in some respects, it is the duty of counsel to offer requests for instructions that will supply the omission and, unless that is done, the judgment will not ordinarily be reversed for such defects."

In the light of such rules, we have examined all of the instructions. In that connection, instructions Nos. 1, 6, and 9 concisely and clearly identified and separately stated the three factors or elements for each or all of which plaintiffs sought damages alleged to have been proximately caused by defendant's dogs. Those and all other instructions as well correctly stated all related issues and properly applied rules of law applicable thereto. In such respect, those instructions separately, comprehensively, and properly submitted plaintiffs' claimed damages for: (1) Plaintiffs' sheep allegedly killed; (2) plaintiffs' sheep allegedly wounded; and (3) plaintiffs' remaining sheep which were allegedly chased and worried, causing them to be thrown off feed and lose weight.

Instruction No. 7, about which plaintiffs complain, said: "You are instructed and cautioned that before the plaintiffs are entitled to recover in this action for any injuries or death to the sheep involved in this action, you must find from a preponderance of the evidence that such injury, loss of weight, or death, if any, were the direct and proximate result of the acts on the part of the dogs involved herein.

"It is for you to determine from all the facts and cir-

cumstances in this case whether or not the dogs belonging to the defendant, George Sprague, caused the alleged injuries, death, or loss of weight of plaintiffs' sheep.

"If you fail to find from a preponderance of the evidence that the injuries or death to the sheep involved herein, if any you find, were the direct and proximate result of any acts on the part of defendant's dogs; or if you find from the evidence that *such injuries or death, if any shown were due to some other cause or some disease from which such sheep were suffering,* then the plaintiffs are not entitled to recover and you should return a general verdict in favor of the defendant." (Italics supplied.)

In that connection, plaintiffs argued that the italicized portion in the last paragraph was not only confusing because not sufficiently specific, but also because it submitted issues not supported by any evidence. It will be noted that the words "such injuries or death" and the first and second clauses of the last paragraph as well, were in the alternative, and as heretofore shown, the jury could have reasonably concluded that "such injuries or death" of plaintiffs' sheep were not the direct and proximate result of any acts on the part of defendant's dogs, thus of necessity either "such injuries or death" were due to some other cause. Also, there was evidence from which the jury could have reasonably concluded that the loss of weight or death of some of plaintiffs' sheep was caused by disease.

The phraseology of the paragraph, from the semicolon after the word "dogs" to the word "then" could as well have been left out, because in effect it had the same meaning as the clause preceding it. The meaning of the phraseology about which plaintiffs complain is not confusing when considered in the light of the instruction of which it is a part, and of preceding and subsequent instructions given which related to the same subject. If, as plaintiffs claim, the last paragraph of instruction

No. 7 was not sufficiently specific in some respects, they should have timely requested other instructions to supply the omission. We conclude that instruction No. 7 was not prejudicially erroneous.

For reasons heretofore set forth, we conclude that the judgment of the trial court should be and hereby is affirmed. All costs are taxed to plaintiffs.

AFFIRMED.

WENKE, J., participating on briefs.