ANDREW H. WHITTINGTON ET AL., APPELLEES, v. NEBRASKA NATURAL GAS CO., A CORPORATION, APPELLANT.

128 N. W. 2d 795

Filed June 5, 1964. No. 35538.

Sidner, Lee, Gunderson & Svoboda, for appellant.

Spear, Lamme & Simmons, for appellees.

Heard before White, C. J., Carter, Messmore, Yeager, Spencer, Boslaugh, and Brower, JJ.

Brower, J.

Plaintiffs Andrew H. Whittington and Gladys Whittington brought this action in the district court for Dodge County, Nebraska, against the defendant Nebraska Natural Gas Company. Its object was to recover damages to real and personal property and incidental expenses of cleaning debris and moving, occasioned by an explosion and fire on the morning of January 30, 1962, at the home of the plaintiffs alleged to have been caused by the negligence of the defendant.

The parties will be designated as they were in the trial court, or at times the plaintiffs will be referred to as the Whittingtons and the first name will be added where one only is concerned. The defendant at times will be called the company.

The trial in district court resulted in a verdict and judgment for the plaintiffs. From an order overruling its motion for a new trial, defendant has appealed the cause to this court.

The home of the plaintiffs where the damage occurred was located at the intersection of First and Logan Streets in Fremont, Nebraska. First Street runs east and west and adjoins the premises on the north, and Logan Street extends north and south on the west side thereof. The home was a 1½-story house owned by the plaintiffs and occupied by them since 1945. Harry Brokaw, a brother of Gladys Whittington, hereinafter designated as Brokaw, lived with them.

The house was of frame construction to which improvements including asbestos shingles had been added. The first floor consisted of a living room on the northeast corner, a dining room on the northwest, and a kitchen towards the center on the south. To the west of the kitchen was an entry and a dinette in the southwest corner. To the east was a bath in the southeast

corner and north of it a utility room from which a door opened to the stairway descending towards the west to the basement. Over the basement stairs was the stairway leading to the second floor from the dining room. Two bedrooms were on the second floor above the living room and dining room area.

The basement was quite small being approximately 8 feet by 10 feet, and the larger portion was under the dining room although it extended a short distance to the east under the living room. The basement floor was cement and its walls were bricked from the floor up to a height of about 4 feet to a dirt ledge and crawl space which continued elsewhere under most of the house.

The furnace, a standard type gas installed in 1951, was located about the center of the south side of the basement. The gas service line protruded through the south side of the house a foot or more above ground level. It then connected to the meter outside the house from which it dropped down into the ground and ran west underground connecting to a gas main near the curb on Logan Street. The Logan Street main in turn was connected with a main running east and west on First Street. First Street and its intersection with Logan Street are paved.

The morning before the explosion, January 29, 1962, the house was cold. Andrew Whittington called the gas company and Gerald McDowell, an employee, came out. He found the pilot light in the furnace was out because dirt and lint were in the pilot fixture. This he removed, cleaned, and reinstalled, and he waited until the furnace was working. Both Andrew Whittington and Brokaw were there at the time. No one smelled gas at that time.

The night before the explosion, both Whittingtons stayed up until after the 10 o'clock news. They went to bed shortly thereafter and turned out the lights although Brokaw had not come home. Before dinner Brokaw took a shotgun shell reloading machine, previ-

ously borrowed by a friend and returned that day, to the basement. After dinner he went to the Eagle Lodge where he stayed until its closing at midnight. After a lunch at the "Chuck Wagon," he returned home. He then went to the kitchen where he read the paper until 1 a.m. when he retired.

The Whittingtons occupied the west bedroom and Brokaw the east one. The dog slept on the floor at the foot of plaintiffs' bed. The dog woke shortly before the explosion, about 5 or 5:30, and Gladys Whittington told him to go back to bed which he did. She supposed she had dozed off again as she was sleeping when the explosion took place.

The time the explosion occurred was fixed at 6:25 a.m. when the kitchen clock stopped. The dog yelped. Gladys Whittington got her flashlight and asked her husband what had happened. She smelled plaster dust but no smoke or gas. Andrew Whittington got his clothes. They saw the window had been blown out, the curtain was gone, and the walls at the northeast corner of the house had been bulged out. Plaster was down in their room and the hall. Gladys Whittington called to her brother asking what happened. Brokaw was lying on the floor and did not know. Gladys Whittington said, "let's get out of here." Brokaw "grabbed" his slippers and they all went downstairs making their way through debris of lath and plaster. In the kitchen they found things in a chaos. Dishes, pots, and pans were on the floor. The stove burners had blown out. Cupboards were open and everything was in disarray.

On his way down, Brokaw stopped at the telephone and called the fire department, telling them there had been an explosion but that he did not know whether or not there was a fire. Thereafter Brokaw ran back to get his clothes. Gladys Whittington went into the living room to get the dog's collar and there where the floor had been blown away she saw fire underneath. All three went out the front door onto the front porch where

they met the firemen coming in. The floorboards on the front porch had been humped up and broken and some boards had been blown out causing them to pick their way. The three went to Brokaw's car which was parked outside where Andrew Whittington got a coat. At the request of neighbors living across Logan Street, they went to their home and watched. Shortly thereafter Andrew Whittington observed smoke and fire coming from the top portion of the east side of the house.

The Whittingtons testified they had smelled neither gas nor smoke before leaving the house, nor at any time previous to the explosion. Brokaw testified he smelled plaster dust but no smoke or gas when he first came downstairs, but on returning after getting his clothes, he saw fire coming out of the wall and smelled smoke.

The captain of the city fire department testified they reached the scene within 4 minutes. He was then in charge as the chief had not yet arrived. There was a little smoke at first but no fire was observed from where their truck was stopped on Logan Street in front of the house. As they started to unload, he was undecided whether to use the booster line, which was their small line, or the heavier lines. As he "hit the ground, * * * the house kind of lit up." Fire was coming from different places. They turned off the gas out at the meter, and took off the big lines. They saw fire in the dining room and hallway, and from the hallway where they could see straight back, they observed fire in the kitchen. Fire was coming up from the basement and had burned through the floor in the living room and a smaller area in the dining room. In a short time the house was filled with smoke and heat and they could no longer enter. The fire had gone into the walls of the house and had traveled up to the attic. In order to fight the fire, the firemen had to get on top of the house and open up the walls. The bulk of the fire was in the basement where it was difficult to fight as the house was low and the basement had only one window well which could be

utilized by only one line. They had trouble first in opening the well containing the basement window and thereafter in making a complete sweep of the fire area under the house. It took them from 45 minutes to 1 hour to put out the fire and six lines of hose were used. When the fire was finally extinguished, a large portion of the living room floor was burned through as was a portion of the dining room floor. The remaining floor over the basement and crawl area near it was badly burned and the floor joists were deeply charred creating an "alligator-like" effect. Charring also occurred in the studding in the walls particularly about the basement stairs and in the walls above.

The evidence hitherto outlined is not disputed. The other evidence attempts to determine the cause of the explosion and fire and will be discussed in connection with the errors to be considered in this opinion.

The petition of the plaintiffs contained allegations attributing negligence to the defendant in permitting the gas mains on Logan and First Streets and the service line entering plaintiffs' residence to have numerous and extensive leaks, and in failing: To replace the mains and service pipe when the defendant knew or should have known that they were in a deteriorated condition; to properly inspect the mains and service line; to properly maintain and repair the mains and service line; to detect gas leaks in the house when defendant inspected plaintiffs' furnace less than 24 hours before the explosion and fire; and to detect the gas leaks and the dangerous accumulations of natural gas on plaintiffs' property.

The defendant in its original answer after a general denial admitted that there was a fire and "non-natural gas" explosion on plaintiffs' premises on the date contained in the petition. It then contained allegations which defendant maintains show contributory negligence on behalf of the plaintiffs as follows: Maintaining and using a small holelike basement partially completed which could not be adequately kept in a fireproof con-

dition; maintaining and keeping a conglomerate of combustible materials in said basement; maintaining and keeping explosive materials, i.e., paints, paint materials, varnishes, gunpowder, and other explosive materials in said basement; failing to maintain and keep adequate ventilation in said basement; and failing to keep and maintain proper wiring.

The defendant by amendment to its answer further alleged that the presence of any natural gas near First and Logan Streets about the time of the explosion was the result of a rupture in defendant's gas main caused by third persons doing plumbing work under the intersection on a frozen water line adjacent to the gas main, and that defendant had no notice of the plumbing work or that the frozen water line or ice from the ruptured water line caused a rupture in the gas main. The amendment also alleged: "That there was first a fire originating in the plaintiffs premises, which burned a sufficient length of time to have caused the subsequent relatively minor explosion by either or a combination of the two. following means: (a) The combustible materials including the wood basement ceiling was of such character and burning under such condition to have produced of itself a wood gas or similar type gas which exploded; or (b) The fire ignited the gunpowder, causing the explosion." The plaintiffs' reply was a general denial.

The trial court submitted all the allegations of negligence in the plaintiffs' petition to the jury in instruction No. 1. Instruction No. 2 stated that the defendant's answer admitted the fire and explosion at the time alleged and denied all other allegations of the petition. Instruction No. 3 set out the general denial in the plaintiffs' reply. Instruction No. 4 placed the burden of proof on the plaintiffs to prove all of the following allegations of the petition, to wit: "I. That the defendant Nebraska Natural Gas Company was guilty of negligence in some one or more of the respects hereinbefore set out in Instruction No. 1. II. That said negligence, if any,

was the proximate cause of the explosion and fire and of the damages sustained by the plaintiffs. III. The amount of such damages, if any."

There is nothing further in the instructions of the trial court setting out or making mention of any theory of the defendant as disclosed by the pleadings and evidence.

The defendant makes numerous assignments of error to the trial court. Those requiring consideration herein will be set forth as they are discussed. In several instances certain assignments are so interrelated they will be discussed together. The defendant contends in its assignments of error that the verdict and judgment are not supported by the evidence and are contrary to law.

The record is voluminous consisting of almost a thousand pages and over 100 exhibits. Only a portion of it will here be reviewed from which this court concludes the jury might reasonably infer the explosion and fire were caused by the presence of natural gas and could attribute its presence to the negligence of the defendant. In many respects it was contradicted by testimony of the witnesses for the defendant and to some extent by the witnesses for the plaintiffs themselves on cross-examination or by disagreement between them.

Certain tests were made for gas in the vicinity of the plaintiffs' home within 1½ hours of the explosion by Harry Strong, the construction foreman of the defendant, in the presence of State Fire Marshal Joseph F. Divis. Further tests were made by Strong thereafter. Vaughn W. Germain, a deputy state fire marshal, made tests on January 31 and February 1, 1962. Professor W. F. Weiland, an expert witness for the plaintiffs, made tests the day after the explosion. Other tests were subsequently made. These tests were made with explosive meters, those by Germain and Weiland being with an M.S.A. meter and those by Strong being with a Davis meter. In the operation of either such meter, holes are poked in the ground with a probe and a hose at-

tached to the meter is inserted into the hole. By pumping a bulb fumes are drawn in and a dial on the meter indicates whether there is an explosive mixture attributable to the presence of gas. The defendant's expert claimed the M.S.A. meter was a 1-scale meter capable of measuring gas concentrations only up to 4.8 percent, whereas the Davis meter had three scales making it more precise and capable of measuring greater concentrations. The lowest scale on the Davis meter is approximately the same as the M.S.A. meter, and by manipulating a lever which brings the two additional scales into operation, only with the Davis meter can higher concentrations be measured. The results of the several readings vary considerably. However, there was evidence that there was gas in the soil along the service line from the meter at the plaintiffs' home to the main on Logan Street and there were heavy concentrations of gas at the four intersection corners of First and Logan Streets. Later a positive leak of the gas pipe in the main under the intersection was established. Some of the tests showed gas in the curb along Logan Street and at various points in the yard around the plaintiffs' house. Witnesses testified that they had observed the tests made by the defendant's employees and that those employees stated there was gas in the area extending even south of the plaintiffs' property but they could not find the leak.

A section of the gas main on Logan Street from which the plaintiffs' service line branched off forming a tee with the main was dug out. Witnesses testified that on standing it up with the lower openings plugged and filling it with water it leaked. There was testimony that when the surface of the soil is frozen, the gas tends to spread out in the soil particularly following service lines, and that it would seep through the soil or foundation into basements. Those purporting to be experts gave their opinions that it did seep into the basement of the plaintiffs. There was testimony that as natural

gas passes through the soil, the odorant which is placed in it so that its presence may be known is removed.

Opinions were given by expert witnesses for the plaintiffs based in part on the tests that were made and in part on their conclusions from the condition of the house and examinations made after the explosion that it was a natural gas explosion. They differed as to the location of the explosion in the house, some asserting it took place in the basement and others that the explosion took place in one of the upper rooms. There is opinion testimony that a portion of the gas arose to the street floor and that the mixture there was in the right proportion to explode; and that the mixture in the basement under the floor was so dense that it could not explode but would and did burn after the explosion producing the fire which spread thereafter through the walls.

The president and other employees of the defendant company testified that the gas system had been purchased by the defendant in the year 1936 and that the mains and the service line of the plaintiffs had been installed before the defendant had purchased it. The defendant had no record as to when they were installed in Fremont, nor did the witnesses of the defendant company know whether any such records were available or where they might be located. The president did not know whether either the Logan Street or the First Street mains had been installed prior or subsequent to 1900. The First Street line had not been repaired or replaced since 1936 and he had no idea whether prior to 1936 it had ever been repaired or replaced. He did not know what material was used in the Logan Street line before it was dug up as the company had no record of repairs being made to the Logan Street line. He testified that the life of the pipe used in the mains and the time in which it would corrode depends on the character of the soil, and that in some instances it goes out in a few years and in others is good for 40, 50, or 60

years.  No soil test had been made by it in the vicinity.

The president testified that the checking of the gas lines of the defendant in Fremont consisted in part of a Heath Survey made once a year.  Heath, located in Massachusetts, sends out one representative to make tests and the defendant supplies an employee to assist him.  The defendant's employee drives a pickup truck and the Heath representative rides and observes the vegetation which is affected by the presence of gas in the soil.  Heath's representative is trained to detect leaks by observing the vegetation.  They make no explosive meter tests unless there is some doubt about an area determinable by the observation of the vegetation.  The defendant has about 140 miles of line in the distribution system in Fremont not including service lines.  The inspection began July 15, 1961, and was completed July 22, 1961, during which period he thought they had worked 44 hours.  In the survey made in 1961, nothing was found to indicate escaping gas in the area of First and Logan Streets.

The defendant's superintendent testified that in the summer of 1961 a college student spent 2 months checking for leaks with a prod tester along the curb lines where mains exist.  The college student had another job and it was uncertain what part of the time he devoted to this particular work.  No one supervised him and his prior training consisted of what he had picked up around the plant.

Consulting engineers from Kansas City had made an examination of the system beginning in 1959 by digging down in places and observing the condition of the pipes as to corrosion.  This examination was not for the purpose of determining leaks but rather to establish a value of the system based on present day costs less depreciation determined by the system's condition.

There was evidence that the grass and other vegetation in and about the plaintiffs' premises and that of their neighbor adjoining on the east had not grown well after

planting, fertilizing, and watering. Repeatedly it had grown up and died shortly thereafter.

In considering whether or not this evidence was sufficient to submit to a jury the question of an explosion and fire caused by a leak in the gas system and the negligence of the defendant attributable thereto, certain rules of law should here be stated.

In Borcherding v. Eklund, 156 Neb. 196, 55 N. W. 2d 643, this court held: "In testing the sufficiency of evidence to support a verdict it must be considered in the light most favorable to the successful party, that is, every controverted fact must be resolved in his favor and he should have the benefit of every inference that can reasonably be deduced therefrom." See, also, Smith v. Platte Valley Public Power & Irr. Dist., 151 Neb. 49, 36 N. W. 2d 478

There are several Nebraska cases concerning injuries attributable to natural gas. In Daugherty v. Nebraska Nat. Gas Co., 173 Neb. 30, 112 N. W. 2d 790, this court held: "A natural gas company transmitting gas to its customers owes a duty to the public to exercise a degree of care commensurate with the danger involved in the transaction of its business.

"One under a duty to use care for which knowledge is necessary cannot avoid liability because of voluntary ignorance.

"The duty to exercise proper care to maintain a gas distributing system is a continuing one.

"Constructive notice under these circumstances is just as effective as actual notice."

In the case of Clough v. North Central Gas Co., 150 Neb. 418, 34 N. W. 2d 862, the following rule in such cases was adopted by this court: " '* * * a gas company owes the duty to the general public to so operate its business and maintain its pipes as to prevent the escape of gas therefrom in such quantities as to become dangerous to life or property.' Newill v. Atlanta Gas-Light Co., 48 Ga. App. 226, 172 S. E. 232."

In the case of Mattson v. Central Electric & Gas Co., 174 F. 2d 215, the United States Court of Appeals in considering the Nebraska law laid down by this court held: "Public utility distributing natural gas for public use must exercise every reasonable precaution to avoid injury or death by escape of gas while it is being carried through its pipes to the consumer, and the care required must be commensurate with danger which it is the utility's duty to avoid.

"Public utility distributing natural gas for public use must not only install pipes and fittings of good material and workmanship but must see that equipment when installed and laid is maintained in a reasonably safe condition.

"The foundation of liability for negligence is knowledge, but in law an opportunity by exercise of reasonable diligence to acquire knowledge is equivalent to knowledge. * * *

"Under Nebraska law, public utility distributing natural gas could not delegate duty it owed to public to exercise proper care to maintain gas system in safe condition, but had continuing duty to exercise proper care to prevent injury from escaping gas."

Considering the evidence set out in light of the law presented by cases cited, we think there was ample evidence on the issue of the defendant's negligence respecting the proper maintenance of its mains and the connections to them and of this negligence being the proximate cause of the explosion and fire to be submitted to the jury. The trial court committed no error in submitting those issues to the jury.

Defendant urges the trial court erred in that it failed to instruct on: The affirmative defenses presented by the defendant's pleadings and evidence; the defendant's theory of the cause as to how the explosion occurred which was supported by the evidence; and the theory that the ruptured gas main in the middle of the intersection was either caused negligently by a third person

or accidentally by a force over which the defendant had no control and had received no notice. It further contends the trial court erred in giving undue weight and credence to the plaintiffs' complaints and contentions in setting out plaintiffs' allegations of negligence in full and at the same time describing the defendant's theory only as a denial of the plaintiffs' claim.

It may here be said that the record discloses no evidence of improper wiring in the plaintiffs' basement or elsewhere on the premises as alleged in the defendant's answer. Further, that the allegations with respect to the plaintiffs' maintaining a small partially completed and improperly ventilated basement which was not fireproof and in keeping combustible or even explosive materials therein does not constitute contributory negligence. Any such materials on the premises are merely conditions. The plaintiffs are not required to keep a basement in proper condition in anticipation of the escape of natural gas. Mere conditions are not the proximate cause of injury. See Jarosh v. Van Meter, 171 Neb. 61, 105 N. W. 2d 531, 82 A. L. R. 2d 714.

The allegations in the amendment to the answer hitherto set out do not set up affirmative defenses but they do allege matters which go to the causation of the fire and explosion and present a question of what was the proximate cause thereof.

In their brief in this court the plaintiffs suggest that the issues raised in the defendant's answer were not affirmative defenses but went to the proximate cause only and could have been raised and tried on a general denial. The instructions set out the plaintiffs' allegations of negligence and casts on them the burden to prove one of them and that such negligence was the proximate cause of the explosion and fire. The plaintiffs contend such instructions followed by one setting out the defendant's general denial were sufficient. The brief further contends at length that there was insufficient proof in the defendant's answer with respect to their alle-

gations as to the cause of the explosion and fire. It is not clear which contention the trial court adopted when it gave the instructions.

The case of Maska v. Stoll, 163 Neb. 857, 81 N. W. 2d 571, lays down the following rule: "It is the duty of the trial court, without request, to instruct the jury on each issue presented by the pleadings and supported by evidence. A litigant is entitled to have the jury instructed as to his theory of the case as shown by pleadings and evidence, and a failure to do so is prejudicial." Although the reports are replete with cases which adhere to this rule, very few of them turn on a situation where affirmative defenses are not involved. There are some however which shed light upon the question before us. The case of Welstead v. Ryan Construction Co., 160 Neb. 87, 69 N. W. 2d 308, was an action to recover damages caused by reason of an automobile collision. Plaintiff's car had stopped at or near a stop sign. The car behind that of the plaintiff bumped into the plaintiff's automobile. The action was between the plaintiff and the defendant as owner and the driver of a truck which was alleged to have been driven into the back of the car behind that of the plaintiff, pushing it forward into the plaintiff's automobile causing the injury. The answer of the defendant contained a general denial and expressly denied that the defendant's driver was guilty of negligence which in any way proximately caused or contributed to the cause of the accident or injuries. It further alleged the collision between the plaintiff's car and the one following her occurred prior to the arrival of the defendant's truck and if the plaintiff received injuries they were occasioned by that collision without any negligence of any kind by the defendant's driver. The trial in district court resulted in a verdict and judgment for the defendant. The judgment in the cited case was reversed on grounds having nothing to do with the question before us, but in remanding the cause for new trial, the court did discuss that question as follows·

"In that connection, contrary to defendants' contention, we have held that such a defense was one entirely consistent with and provable under the general issue. As held in Styskal v. Brickey, supra (158 Neb. 208, 62 N. W. 2d 854): 'Where it is claimed that the conduct of another, not a party to the suit, was the sole proximate cause of the accident such defense is not an affirmative plea in avoidance of plaintiff's cause of action and imposes no burden of proof upon defendant with relation thereto but is one entirely consistent with and provable under the general issue. However, some place in the instructions the jury should be advised that if it should find the sole proximate cause of the accident in which plaintiff was injured was the negligence of the other then its verdict should be for the defendant.' "

In McKain v. Platte Valley Public Power & Irr. Dist., 151 Neb. 497, 37 N. W. 2d 923, the plaintiff and appellee brought an action to recover damages to his land and crops claimed to have been caused by water alleged to have escaped from reservoirs and canals of the defendant. The defendant alleged that the damage was wholly caused by rainfall and other things natural to the area set out at some length. Under these facts, the court said: "The evidence would have sustained a finding that any damage sustained by appellee because of the seeped condition of his land: (1) Was wholly the result of waters from the works of appellant; or (2) was wholly caused by rainfall and other things natural to that area; or (3) was the result of both the waters from the canal and reservoirs of the appellant and natural conditions including high precipitation.

"An issue as to the extent natural conditions had contributed to the waterlogging of lands of appellee, and any damage resulting therefrom, was made in the trial court, and its failure and refusal to instruct the jury in reference thereto is assigned and discussed in this court. The attention of the court was directed to this issue by a proper instruction tendered by appellant. It is the

mandatory duty of the trial court, without request, to instruct the jury on each issue presented by pleadings and evidence. Fimple v. Archer Ballroom Co., 150 Neb. 681, 35 N. W. 2d 680; Hackbart v. Rohrig, 136 Neb. 825, 287 N. W. 665. A litigant is entitled to have the jury instructed as to his theory of the case shown by pleading and evidence, and it is prejudicial error to fail to instruct the jury on such theory," citing cases.

In the present cause the contentions of the defendant as to the proximate cause of the explosion and fire were plainly set forth in its amendment to the answer. The trial consisted largely in an attempt by both parties to prove their respective theories and contentions with respect to the proximate cause. We need only here to conclude that if there is evidence sufficient to support a theory set out in the allegations of the defendant's answer that the proximate cause of the injuries to the plaintiffs' property was in no way attributable to any negligence of the defendant, that theory should be submitted under a proper instruction to the jury.

It now becomes necessary to refer to the evidence which might support the theory of the defendant. It too was contradicted in several respects by the plaintiffs' witnesses and on cross-examination.

Several witnesses testified, including Professor C. J. Frankforter and Harold Cartier who testified as experts, that the explosion could not have been a natural gas explosion. Gas is much lighter than air and according to the "kinetic" theory gas diffuses rapidly with air. The lower explosive limit of natural gas is about 4½ percent and the upper explosive limit is up to about 14 percent. Below the lower limit it will not explode and a lighted match would produce no effect. Above the upper limit there would not be enough oxygen mixed with it to permit it to explode and the match would go out. Because of the rapid diffusion of natural gas with air, if the explosive limit were reached a large area of the house would have at the same time been filled with

it and the result would have been an explosion completely demolishing the house. There was no evidence according to these witnesses of an explosion in the basement or in the furnace where the pilot light was burning. Because of the rapid diffusion, had natural gas been present it would have mixed with the air in the basement and upstairs in a short period and it would have been impossible for a richer mixture to have been left in the ceiling of the basement and crawl area to burn after the explosion. Testimony of the plaintiffs' witnesses showed they made no tests in the basement after the gas was again turned on. However, Harry Strong, the witness who made the tests with the Davis meter testified he made such tests and found no natural gas in the basement, the house, or in the soil under it, and he denied making certain statements attributed to him about the presence of an explosive amount of gas close to the house. There was testimony that natural gas, although it might lose the odorant originally placed in it, takes on a very sour and disagreeable odor in passing through soil and that such odor would have been detected by the occupants of the house and those making examinations had it been present.

There was testimony that the M.S.A. meter registered the gas content at only up to about 5 percent and that that was the most shown in an area near the plaintiffs' home. To a large extent the gas would follow the pipe to the meter and be diffused in the air. The windows in the house being open in the evening, any gas would have escaped outdoors and any in the basement through the furnace flues before reaching explosive proportions.

Witnesses testified that there was a large amount of combustible material in the basement consisting of curtain stretchers, picnic table, paint cans, floor cleaner, lawnmower oil, boot grease, boxes, paper, cases of loaded shotgun shells, and boxes of unloaded shells. Photographs of the material left in the basement after the fire show that a considerable amount of the foregoing

items were burned or partly burned. Some show only considerable heat and scorching. Brokaw testified he may have spilled some gunpowder in the basement.

The defendant's experts contend that a fire could not permeate the house so rapidly nor could it have been showing in the living room in the short period of time before the firemen arrived unless it had already been burning in the basement before the explosion. They testified the explosion took place upstairs and not in the basement. There was little or no fire under the crawl space near the entrance of the gas line or near the line leading to the meter from whence it was assumed the gas had come. The floor above the basement and to the east of it was badly burned, and the floor joists which were quite heavy were badly charred as were the stairway, the door opening to the basement stairs, and the area above it.

There was testimony that when the section of pipe that joined with the service line, being the one tested by the plaintiffs, was reached, it lay under the curb. The ground was frozen and they had difficulty moving it. The defendant's employees at the request of the fire department pulled the pipe out with the boom truck using a cable and a winch, and in so doing caused the pipe to bend and to break some of the threads at the connection causing the leak. Soap tests which were made on the pipe when it lay in place in the ground showed no leak.

A leak of natural gas was found not far from the southwest corner of the intersection of First and Logan Streets. The contentions of the defendant that the ruptured gas main in the middle of the intersection was caused negligently by those working on the water main was contradicted by the evidence of plaintiffs' witnesses that the work did not commence until after the explosion. By the defendant's examination of its own witnesses in surrebuttal it appears to have abandoned this contention although they did maintain that the freezing of water

mains closely paralleling the gas main caused an expansion under the ground which broke a joint in the gas main. There was testimony that this accounted for the presence of natural gas at the four corners of the paved intersection when tests were made. It was claimed that the gas escaping from this break would spread out in a circle and would not have reached the plaintiffs' premises in sufficient quantities to explode.

The defendant's experts expressed their opinions that there was no natural gas explosion but that the explosion occurred from gases produced by the burning wood and materials in the basement and stairway. They termed it a mere "puff," not indicating a natural gas explosion which would have demolished the house.

We conclude that from the above evidence the jury if it gave it credence might find that the proximate cause of the explosion and fire were from other causes and that to instruct the jury fully in regard to the contentions of the plaintiffs without setting forth the theory of the defendant gave undue emphasis and stress to the plaintiffs' claims. It tended to confuse and mislead the jury and was prejudicial. The jury should have been instructed that the defendant claimed the proximate cause of the explosion and fire arose solely from other causes setting them out sufficiently to state defendant's theory of the case. The failure to do so requires a new trial of the cause.

Inasmuch as the cause must be retried in district court, it will be necessary to refer to some other errors urged by the defendant. The defendant submitted instructions including a cautionary instruction upon circumstantial evidence which is here set out: "The law requires that the facts and circumstances proved together with the inferences that may be legitimately drawn from them, shall indicate with reasonable certainty the negligent act complained of." This states the law substantially the same as set forth in Graves v. Bednar, 171 Neb. 499, 107 N. W. 2d 12. In Norman v.

Sprague, 167 Neb. 528, 93 N. W. 2d 637, this court held that such an instruction was not-necessary unless it was requested by the party desiring it. In the present cause it was directly requested apparently the day before the jury was instructed by the trial court. A great deal of evidence in this cause was of necessity circumstantial. There was no such instruction given by the court on its own motion although circumstantial evidence was defined. The clear implication of Norman v. Sprague, *supra,* is that the tendered instruction should have been given on request.

The defendant assigns as error to the court the over-ruling of motions of the defendant challenging the foundation and qualifications of the plaintiffs' expert witnesses. It objected to the opinions of State Fire Marshal Joseph F. Divis, his deputy, Vaughan W. Germain, and Professor W. F. Weiland when they gave their opinions as to the cause of the fire. An examination of the record shows that their qualifications were recited at considerable length. No good purpose would be served by lengthening this opinion by setting them out at length. The fire marshal and his deputy had served in their respective offices for many years and in other fire departments. They had investigated many fires and had attended schools for the purpose of being instructed in such work. Professor Weiland, who had been an instructor at the University of Nebraska and held degrees from the Universities of Nebraska and Pittsburg, had long experience with fuel combustion processes and had investigated accidents, explosions, and fires. They were all questioned at length as to the foundation for their opinions. The defendant's experts qualified as chemists and defendant contends knowledge in chemistry was a necessary qualification for an opinion as to the cause of the explosion and fire. It would seem the question of its cause might be approached from various angles and from other fields of knowledge. "Whether a witness' qualification to state his opinion is sufficiently

established rests largely in the discretion of the trial court, and its ruling thereon will not ordinarily be disturbed on appeal unless there is a clear showing of abuse." Elliott v. Swift & Co., 151 Neb. 787, 39 N. W. 2d 617. There is no merit in the defendant's contentions with respect to these witnesses.

There is objection to the opinion of Dr. A. J. Merrick concerning his opinion of the cause of the dizziness suffered by Gladys Whittington who had been his patient over an extended length of time. By a hypothetical question he was asked whether he had an opinion as to the cause of her dizziness and nausea with reasonable medical certainty. He answered, "I can't say with reasonable medical certainly (sic). I should say that according to —." Objections were made to his further testimony because he could not give an opinion with such certainty. He was then asked, "Can you say with reasonable medical certainty that it would be possible that she would have the effects which we described and which you have observed from the effects of natural gas?" Objections were made to this for the reasons that they should not deal in possibilities but with reasonable medical certainty and that it was incompetent, irrelevant, and immaterial. Over repeated objections, Dr. Merrick was allowed to answer: "I think it would be reasonable to say that among the causes for these symptoms the possibility of exposure to gas would have to be considered." It seems apparent that the objections should have been sustained and the answer excluded.

The trial court submitted as one of the grounds of negligence alleged by the plaintiff the question of defendant's failing to detect gas leaks in the house when defendant inspected the plaintiffs' furnace less than 24 hours before the explosion and fire. This related to the defendant's employee who cleaned the pilot fixture on request the day before. His attendance had been requested to start the furnace. There then had been no

odor of gas. Brokaw and another man were there. There was no suggestion that he should inspect the premises for leaks and the allegation of negligence concerning defendant's duty to make an inspection at that time was without support in the evidence. No assignment of error in regard to the submission of this issue is made but it should not be submitted without supporting evidence at the new trial of the cause.

Because of the trial court's failure to include in its instructions the theory of the defendant as to the proximate cause of the explosion and fire, the verdict and judgment must be set aside and the cause remanded for new trial in conformity with this opinion.

REVERSED AND REMANDED.