NORTHERN NATURAL GAS COMPANY, A CORPORATION, APPELLANT, V. BEECH AIRCRAFT CORPORATION, A CORPORATION, APPELLEE.

275 N. W. 2d 77

Filed February 6, 1979. No. 41843.

John A. Rickerson of Rickerson & Welch, for appellant.

Karl F. Schmidt of Morrison, Hecker, Curtis, Kuder & Parrish and Robert G. Fraser of Fraser, Stryker, Veach, Vaughn, Meusey, Olson & Boyer, P.C., for appellee.

Heard before KRIVOSHA, C. J., McCOWN, CLINTON, and BRODKEY, JJ., and STANLEY, District Judge.

KRIVOSHA, C. J.

This is an action for damages based upon the appellant's theory that the appellee had negligently de-

signed and manufactured an aircraft as set out in the petition. At the close of the appellant's case the appellee moved for a directed verdict which was sustained by the trial court. The action was thereupon dismissed and appeal taken to this court. We concur with the action of the trial court in granting the motion and directing a verdict, and accordingly we affirm.

The appellant was the owner of a Beechcraft King Air aircraft which crashed near Kirksville, Missouri, on March 11, 1966. The accident occurred at approximately 12:14 p.m. Just prior to the accident the aircraft was cruising at 16,000 feet when the right engine flamed out and shortly afterwards the left engine flamed out. The pilot testified he used the restart procedure, but was unable to get either of the two engines started. The loss of power necessitated an emergency landing which totally destroyed the aircraft.

In its fourth amended petition appellant alleged that the appellee had negligently designed and manufactured the aircraft with regard to certain inlet guide vanes. Because of the allegedly faulty design, ice was caused to form which in turn blocked the entrance of air and caused the engines to stop.

At trial the appellant called several witnesses, including the pilot, who described the events which occurred from the time the plane took off on March 11, 1966, from Roanoke, Virginia, until the time of the crash near Kirksville, Missouri.

Without objection appellant offered in evidence exhibit 25 which consisted of surface weather observations taken by the National Weather Records Center on March 11, 1966, at Roanoke, Virginia; Bluefield, West Virginia; Huntington, West Virginia; Lexington, Kentucky; Louisville, Kentucky; Bloomington, Indiana; Matton, Illinois; Springfield, Illinois; Quincy, Illinois; Kirksville, Missouri; Terre Haute, Indiana, and Columbia, Missouri. No witness, how-

ever, up to that point, had testified as to the design of the aircraft or in any manner which tied the crash of the aircraft to the alleged defective design of the inlet guide vanes.

As a matter of fact, the pilot testified that just before the flame outs occurred he was flying at 16,000 feet in clear air and 7,000 to 8,000 feet above any clouds. He further testified there was no indication of icing conditions nor was there any visible moisture. In his opinion the weather was not a factor in the accident.

Appellant then called to the stand one W. Stewart Roberts who testified he was an engine failure investigating engineer. Through a series of questions the witness was qualified as a mechanical engineer with knowledge about engines. He did acknowledge he was not a meteorologist and had not taken any courses in meteorology. During an offer of proof, Roberts testified that in his senior year at M.I.T. he had majored in air conditioning and refrigeration from which he believed he had gained his knowledge concerning humidity.

Without objection, exhibits 34 and 35 were then offered and received in evidence. Exhibit 34 was a certified true copy of the records on file in the National Climatic Center, Asheville, North Carolina, taken on March 11, 1966, at 6 o'clock in the morning and 5 o'clock in the evening. The records consisted of a constant pressure chart for Columbia, Missouri, and a constant pressure chart which covered a wider area. The exhibit also contained dry bulb and dew point measurements taken at an altitude of 18,000 feet over Omaha, Nebraska; Topeka, Kansas; Columbia, Missouri; and Peoria, Illinois, at 6 o'clock in the morning and 6 o'clock in the evening on March 11, 1966. The closest point to the scene of the crash recorded by the exhibit was Columbia, Missouri, more than 100 miles from the crash scene. Likewise, the recordings were taken 6 hours before

or 6 hours after the crash and at an altitude of at least 2,000 feet higher than the altitude at which the plane was flying when the flame outs occurred. Exhibit 35 was never fully explained, but appears to be radar tracings for the United States taken on March 11, 1966. After several further questions concerning temperatures, the trial court declared a recess and a meeting was held on the record out of the presence of the jury in the trial court's chambers.

During that conference in chambers Mr. Rickerson, attorney for appellant, stated that Roberts intended to read the dry bulb and dew point readings from Omaha, Nebraska; Topeka, Kansas; Columbia, Missouri; and Peoria, Illinois, from exhibit 34. According to Mr. Rickerson, Roberts, using the data from Omaha, Topeka, Columbia, and Peoria on exhibit 34, would estimate the weather and temperature near Kirksville, Missouri, at an altitude of 16,000 feet at the time the engines quit at 12:14 p.m. From his estimates of the weather at the time and place the engines quit, Roberts would then testify there would be a relative differential between the dry bulb and the dew point of 4 degrees. He would further testify that when the air entered the engine through the air intake, it then went through the air screen and through the inlet guide vane assembly. Because of a change in velocity of the air, there would be a drop in temperature sufficient to go below the dew point and thus cause the moisture in the air to freeze on the inlet guide vanes, blocking them. This blockage would cause the stoppage of air flow to the engines, and stop the engines. There was no testimony that such a calculation could be made or that experts in the field of meteorology would use the information upon which the witness Roberts based his calculations. In addition, there was no evidence introduced as to whether it would be reasonable to render an opinion based upon those calculations.

The trial court then advised appellant's counsel that, in the court's opinion, the data sought to be introduced by appellant went far beyond data reasonably relied upon by experts in that particular field. Specifically, the trial court stated that the court had no question the witness was an aeronautics engineer who could testify to any data that an expert in that field reasonably relied upon. The trial court specifically advised appellant that if appellant's witness had any data that experts rely upon reasonably, he could use that data but, in the opinion of the trial court, to interpret cold fronts and readings of 5 hours before or after and 100 miles away from the scene of the accident was too speculative, and would not be admitted.

Following the conference in chambers but outside the presence of the jury, appellant, by way of an offer of proof, had Roberts testify about the matters of which he had earlier advised the court. Following the offer of proof the court advised appellant that the ruling would be the same and the offer would not be received.

Appellant then rested. Appellee moved for a directed verdict on the basis there was no evidence of causation introduced. The motion was sustained and the action dismissed.

Without question, under our Rules of Evidence in an appropriate case, an expert may render an opinion without first disclosing the underlying data upon which that opinion is based. § 27-705, R. R. S. 1943. It is further clear under our Rules of Evidence that such opinion may be rendered in response to a direct question and need not be based upon a hypothetical set of facts submitted to the expert.

That rule, however, does not in and of itself permit anyone to qualify as an expert upon his own declaration or to render any opinion he desires.

Before an expert opinion can be rendered, it must be shown that such opinion is of a scientific, techni-

cal, or other specialized knowledge which will assist the trier of fact to understand the evidence or to determine a fact in issue, and that the witness qualifies as such expert by knowledge, skill, experience, training, or education. § 27-702, R. R. S. 1943. There is no exact standard for fixing the qualifications of an expert or skilled witness. Mathine v. Kansas-Nebraska Nat. Gas Co., Inc., 189 Neb. 247, 202 N. W. 2d 191. Such a witness will be deemed qualified if and only if he possesses special skill or knowledge respecting the subject matter involved so superior to that of men in general as to make his formation of a judgment a fact of probative value. Kohler v. Ford Motor Co., 187 Neb. 428, 191 N. W. 2d 601.

While under our Rules of Evidence the expert may not be required to disclose the underlying facts or data before rendering his opinion, the trial court on its own motion can require such disclosure. § 27-705, R. R. S. 1943. In this case the trial court made such a requirement, and upon hearing what the expert proposed to testify, concluded that neither the record nor the apparent qualifications of the expert would justify such an opinion. A trial court is given large discretion in determining whether or not the witness' qualification to state his opinion has been established, and this discretion will not ordinarily be disturbed on appeal unless there is an abuse of that discretion. Whittington v. Nebraska Nat. Gas Co., 177 Neb. 264, 128 N. W. 2d 795; Mathine v. Kansas-Nebraska Nat. Gas Co., Inc., *supra.*

If an expert witness is to be permitted to render an opinion without prior disclosure of the underlying facts or data upon which his opinion is based, then the expert must at least establish by competent evidence that the matter involved in the opinion is of such nature that experts within the specific field could render an opinion. Moreover, when requested by the trial court, such expert should be required to produce sufficient evidence to establish that the un-

derlying facts or data are of such a nature that an expert in the particular field would use or would rely upon such facts to reach a conclusion. Flory v. Holtz, 176 Neb. 531, 126 N. W. 2d 686; Brugh v. Peterson, 183 Neb. 190, 159 N. W. 2d 321.

A trial court may, either on its own motion or in response to an objection, require an expert to disclose the underlying facts or data upon which the opinion is to be based before permitting the expert to render his opinion. Unless it is shown that there has been an abuse of discretion the action of the trial court, in either requesting such underlying data or information or refusing such request, will not on appeal be disturbed.

The record in this case is totally devoid of any evidence that an expert in weather would attempt to render an opinion such as that sought to be tendered by appellant's expert herein; or that the information relied upon by the expert was of such type that an expert on weather would rely upon such information in rendering an opinion. In the absence of such evidence we agree with the trial court that any opinion tendered by the expert in this case would be based on pure speculation and be solely without any basis or foundation. The action of the trial court in sustaining the objection to the opinion was in all respects correct.

Appellant then elected to offer no further evidence and to rest on the state of the records. At that point, the trial court had no alternative but to sustain the motion for a directed verdict and to dismiss the action. The trial court was correct and the judgment dismissing the action is affirmed.

AFFIRMED.