DOROTHY H. DANIELSEN, APPELLEE AND CROSS-APPELLANT, V. RICHARDS MANUFACTURING COMPANY, INC., APPELLANT AND CROSS-APPELLEE, AND MISDOM-FRANK CORPORATION ET AL., APPELLEES.

294 N. W. 2d 858

Filed July 15, 1980. No. 42840.

Harold L. Hadland of Cassem, Tierney, Adams, Gotch & Douglas, for appellant.

Abrahams, Kaslow & Cassman, for appellee Danielsen.

Heard before KRIVOSHA, C. J., BOSLAUGH, McCOWN, CLINTON, BRODKEY, WHITE, and HASTINGS, JJ.

CLINTON, J.

Plaintiff, Dorothy H. Danielsen, brought this action against the defendant, Richards Manufacturing Company, Inc., a supplier of surgical instruments, and others, to recover damages for personal injuries suffered when a 7-inch straight pituitary rongeur, belonging to and used by the plaintiff's surgeon, Dr. Gerald E. Ries, fractured during a partial hemilaminectomy, leaving a portion of the jaw of the instrument embedded in a vertebral disc. The broken part was removed in later surgery also performed by Dr. Ries. It was alleged that the instrument was defective and unnecessarily dangerous when sold to the Orthopedic Clinic, a professional corporation of which the surgeon was a member. The cause was submitted to a jury which was unable to agree upon a verdict. A mistrial was declared and the jury discharged. The defendant Richards, having made a motion for a directed verdict at the close of all the evidence, which was denied, made a timely motion under the provisions of Neb. Rev. Stat. § 25-1315.02 (Reissue 1979) for judgment in accordance with its prior motion. The motion for judgment was denied and a new trial ordered. Richards has appealed under the provisions of Neb. Rev. Stat. § 25-1315.03 (Reissue 1979). We affirm.

The motion of Richards for judgment was founded upon the following premises: (1) The evidence was insufficient to establish that the fractured rongeur was supplied by the defendant Richards; and (2) The expert opinion of one Norris Yonker, a witness for the plaintiff, as to the existence and cause of the alleged defect which resulted in the fracture of the rongeur was inadmissible. As a consequence, there was no proof of the existence of a defect making the instrument unreasonably dangerous for the purpose for which it was to be used. The defendant's five assignments of error resolve into those two issues. We discuss the issues in the order listed.

Richards maintains proof that the rongeur used in the operation was supplied by it is supported only by evidence which is wholly circumstantial and is insufficient to sustain the verdict because it is equally inferable that the rongeur used during the surgical procedure was supplied by some other, unknown, supplier. The defendant cites and relies upon such cases as *Popken v. Farmers Mutual Home Ins. Co.,* 180 Neb. 250, 142 N.W.2d 309 (1966); *Barkalow Bros. Co. v. Floor-Brite, Inc.,* 188 Neb. 568, 198 N.W.2d 329 (1972); and *So Soo Feed & Supply Co. v. Morgan,* 192 Neb. 277, 220 N.W.2d 25 (1974).

The surgery involved in this suit was performed on October 28, 1976, at St. Joseph Hospital in Omaha. The evidence shows that at that time and for some time prior thereto, doctors using the hospital facilities for surgery furnished their own surgical instruments which were stored and cared for at the hospital. The hospital personnel marked the instruments by stamping or etching thereon the name or names of the owner. In this instance, the rongeur which fractured while being used by Dr. Ries bore the following markings: ''12-20-72 Jensen-Ries-Tribulato-Kinney.'' These names are the surnames of the four orthopedic surgeons who were members of the Orthopedic Clinic.

Dr. Ries testified that in searching the clinic records, he determined that during 1972 the clinic purchased only two 7-inch straight rongeurs of the general type used in this particular surgery. One was purchased from the defendant Richards and the other from another supplier named Zimmer. Both suppliers purchased their instrument from the same manufacturer. Dr. Ries produced from the office records of the clinic an invoice from Richards to the clinic dated December 12, 1972, which described a 7-inch straight pituitary rongeur. He testified that the broken rongeur was the one listed in the invoice. He stated that shortly after the delivery of the instru-

ment, he personally took it to St. Joseph Hospital where he gave it to hospital personnel, whose identity he could no longer remember, and that it was marked as above described in accordance with the usual practice. Dr. Ries identified the particular rongeur by associating the time of the invoice and the date of the markings.

Dr. Ries also identified an invoice from the office records dated September 20, 1972, which indicated the purchase from Zimmer of a stainless steel straight rongeur identified on the invoice as number 3363. A page from the Zimmer catalogue identified number 3363 as a 7-inch straight pituitary rongeur. The Zimmer rongeur could not be found at the time Dr. Ries first testified, but later during the trial he located such a rongeur at another hospital after a search. This instrument bore the logo "Z" and the number 3363. It also had imprinted thereon the name, "Ortho Clinic." On the opposite side it bore the imprint, "Ortho Associates, LFT." Dr. Ries testified that the words "Ortho Clinic" identified the Orthopedic Clinic of which he was a member in 1972. In 1975, two of the doctors left the clinic to practice in another association and the surgical instruments were divided among the parties. Dr. Ries testified that "Ortho Associates" was the name used by Drs. Tribulato and Kinney after they left the Orthopedic Clinic. He stated that the initials "LFT" stood for Louis F. Tribulato. He testified that the Orthopedic Clinic had purchased that instrument and that he had also taken it to St. Joseph Hospital for marking, but not at the time he took the one purchased from Richards. This instrument bore no date.

Dr. Ries testified that all Zimmer rongeurs, when received, bore the "Z" logo. This testimony was corroborated by other testimony.

Richards admitted that it had sold an unmarked pituitary rongeur of the type in question to the Orthopedic Clinic in December 1972. However, it main-

tained that all of its rongeurs were dull or satin finish and did not have the bright finish of the rongeur which fractured during surgery. There was evidence in the record which tended to contradict that claim.

In *Popken, supra,* cited by Richards, we said:

The plaintiffs may establish their case by circumstantial evidence as well as by direct evidence.

However, circumstantial evidence is not sufficient to sustain a verdict depending solely thereon for support, unless the circumstances proved by the evidence are of such nature and so related to each other that the conclusion reached by the jury is the only one that can fairly and reasonably be drawn therefrom. Mullikin v. Pedersen, 161 Neb. 22, 71 N. W. 2d 485.

The evidence must be such as to make the plaintiff's theory of causation reasonably probable, not merely possible.

*Popken* at 255, 142 N.W.2d at 313. Applying that principle to the present case, and assuming that the evidence is wholly circumstantial, the evidence was sufficient to make the identification of the source of the broken rongeur reasonably probable and not merely possible. We hold that the evidence was sufficient to permit the jury to find, with reasonable certainty, that Richards was the supplier of the rongeur used in the surgery performed on the plaintiff. We have closely examined the cases cited by Richards. The differences in the nature of the foundational evidence in the cases cited and that in the case before us are evident. We will not discuss them.

Norris Yonker, a metallurgical engineer, testified on behalf of the plaintiff. He described his education and experience, which included analysis and determination of the causes of cracking and breaking

of metals in thousands of cases, including metal of the type of which the rongeur was made. He made an examination of the broken rongeur by use of a stereoscopic binocular microscope. He found no evidence that indicated the instrument had been physically abused in any way that would be a cause of breaking. His examination indicated that there were "two distinct modes of fracture": The "pre-existing fracture prior to the final fracture of the movable jaw," and the final fracture which occurred at the time of surgery.

The "pre-existing fracture" emanated from the pinhole which was the pivot pinhole of the movable jaw. The pre-existing fracture covered 62 percent of the cross-sectional area; the final fracture, the remaining 38 percent. The difference between the modes of fracture was indicated by the granular appearance of the pre-existing fracture. He explained various tests he had made, including hardness tests, and described the process used in the manufacture of the instrument, including heating, quenching, reheating, and the tempering by means of which the metal is given its strength. At a later time, after the tip of the broken jaw was removed in the second surgery, he examined that part also. His conclusion was that because of the pre-existing crack, the load required for final separation was much less than normally would be withstood by the instrument.

Yonker stated his opinion as follows:

[A]s a result of my initial examination and the observance of the pre-existing crack, was that the pre-existing crack was a forging or heat-treating crack initiated during the manufacture of the rongeur, or it was a stress-corrosion crack, resulting from assembly and/or residual stresses in the movable jaw.

He first concluded that the pre-existing crack was a

stress-corrosion crack and the final fracture was the result of a sudden failure. His opinion of the cause of the pre-existing crack was that during the manufacture of the product, machine marks were left on the instrument instead of a proper polish. He observed the machine marks in the course of his examination and explained how he identified them. He testified that such a mark "lowers the corrosion resistance tremendously."

He also measured the hardness of the fractured portion of the instrument, i.e., the upper jaw. It showed a hardness described as 50 to 51 Rockwell C. He tested the hardness of the lower jaw. It tested Rockwell C46 to 47. His opinion was that the upper jaw was insufficiently tempered during the heating process. This made it more susceptible to stress-corrosion cracking. His final opinion was: "[T]he stress corrosion cracking, which was present, was the result of manufacturing defects which were namely the excessive hardness of the movable jaw and the poor surface finish, and the assembly stresses at the pinhole were most likely a contributing factor." He further stated that if the instrument were properly manufactured, it "would exhibit wear at the hinge pinhole as a result of wear of the pin itself through usage for a considerable period of time." Wear at the pinhole itself would not result in a fracture. It would merely make the moving parts loose.

Yonker stated that visual examination before the operation would not disclose the pre-existing crack. It might, however, have been discovered by a functional test immediately before the operation by using the instrument to bite down on a hard piece of rubber.

Richards attacks the admissibility of Yonker's testimony on several grounds: First, the qualifications and competency of the witness; Second, the competence of the opinion in that the basis therefor was

not disclosed in the evidence.

Richards cites and relies upon our opinions in *Northern Nat. Gas Co. v. Beech Aircraft Corp.,* 202 Neb. 300, 275 N.W.2d 77 (1979); and *Clearwater Corp. v. City of Lincoln,* 202 Neb. 796, 277 N.W.2d 236 (1979).

The attack on the qualifications of the witness is based upon the fact that Yonker had no specific experience in the testing of surgical instruments. In contrast, Richards' expert, whose qualifications and experience were similar to Yonker's, had some experience in testing surgical instruments, especially materials used in bodily implants. The record does establish, however, that Yonker had experience in testing the type of metal of which the rongeur was made.

An examination of Richards' arguments in its brief discloses that its real argument is that its expert is better and more competent than the plaintiff's expert. This may be true, but it was a matter for the jury to decide in weighing the testimony. It might be noted in passing that Richards' expert testified that Yonker was competent, but he felt that Yonker was not thorough enough in his examination. Richards' expert was of the opinion that the stress-corrosion crack was caused by failure to clean the instrument properly, thus leaving corrosive residues, such as blood, on it.

> There is no exact standard for fixing the qualifications of an expert or skilled witness. Mathine v. Kansas-Nebraska Nat. Gas Co., Inc., 189 Neb. 247, 202 N. W. 2d 191. Such a witness will be deemed qualified if and only if he possesses special skill or knowledge respecting the subject matter involved so superior to that of men in general as to make his formation of a judgment a fact of probative value. Kohler v. Ford Motor Co., 187 Neb. 428, 191 N. W. 2d 601. . . .

> A trial court is given large discretion in determining whether or not the witness' qualification to state his opinion has been established, and this discretion will not ordinarily be disturbed on appeal unless there is an abuse of that discretion. Whittington v. Nebraska Nat. Gas Co., 177 Neb. 264, 128 N. W. 2d 795; Mathine v. Kansas-Nebraska Nat. Gas Co., Inc., supra.

*Northern, supra,* at 306, 275 N.W.2d at 81. The trial court did not abuse its discretion in determining that Yonker's qualifications as an expert were sufficient.

The attack on the competency of the opinion is grounded upon the contention that Yonker did not disclose its basis. Neb. Rev. Stat. § 27-705(1) (Reissue 1979) provides:

> The expert may testify in terms of opinion or inference and give his reasons therefor without prior disclosure of the underlying facts or data, unless the judge requires otherwise. The expert may in any event be required to disclose the underlying facts or data on cross-examination.

From our reading of both *Northern, supra,* and *Clearwater, supra,* we conclude that they do not support the position of Richards. In *Clearwater, supra,* we discussed the factual basis for the opinion of the experts, saying:

> The witness Strawn based his opinion upon three principal factors: The value of the gravel deposits upon the property; sales of lots in developed recreational areas; and comparable sales of real estate. None of these factors supported the conclusion testified to by the witness. . . . A similar situation existed as to the testimony of the witness Warren.

*Clearwater* at 804-05, 277 N.W.2d at 241-42.

In *Northern, supra,* the trial court rejected the

opinion of the witness. We upheld that ruling, saying:

> If an expert witness is to be permitted to render an opinion without prior disclosure of the underlying facts or data upon which his opinion is based, then the expert must at least establish by competent evidence that the matter involved in the opinion is of such nature that experts within the specific field could render an opinion. Moreover, when requested by the trial court, such expert should be required to produce sufficient evidence to establish that the underlying facts or data are of such a nature that an expert in the particular field would use or would rely upon such facts to reach a conclusion. Flory v. Holtz, 176 Neb. 531, 126 N. W. 2d 686; Brugh v. Peterson, 183 Neb. 190, 159 N. W. 2d 321.
>
> A trial court may, either on its own motion or in response to an objection, require an expert to disclose the underlying facts or data upon which the opinion is to be based before permitting the expert to render his opinion. Unless it is shown that there has been an abuse of discretion the action of the trial court, in either requesting such underlying data or information or refusing such request, will not on appeal be disturbed.

*Northern* at 306-07, 275 N.W.2d at 81.

In *Clearwater, supra,* we said:

> Expert testimony should not be received if it appears the witness is not in possession of such facts as will enable him to express a reasonably accurate conclusion as distinguished from a mere guess or conjecture. The witness should not be allowed to express an opinion on an inadequate basis or in respect to facts not disclosed to the jury. Gil-

bert v. Gulf Oil Corporation, 175 F. 2d 705 (4th Cir., 1949). See, also, Horton v. W. T. Grant Co., 537 F. 2d 1215 (4th Cir., 1976); Wilson v. Volkswagen of America, Inc., 561 F. 2d 494 (4th Cir., 1977); Polk v. Ford Motor Co., 529 F. 2d 259 (8th Cir., 1976); Omaha Indian Tribe, Treaty of 1854, Etc. v. Wilson, 575 F. 2d 620 (8th Cir., 1978); Tabatchnick v. G. D. Searle & Company, 67 F. R. D. 49. Where the opinion testimony of an expert witness does not have a sound and reasonable basis it should be stricken. Arkansas-Missouri Power Co. v. Sain, 262 Ark. 326, 556 S. W. 2d 441.

*Clearwater* at 804, 277 N.W.2d at 241.

In this case, both the basis of the opinion and the facts on which it was based were before the jury. Yonker did testify to the information on which his opinion was based. We further note that the defendant had an opportunity to and did cross-examine Yonker, both as to his competence and as to the basis of his opinion. The trial court did not abuse its discretion in admitting Yonker's opinions.

AFFIRMED.